All rise. United States Court of Appeals for the Ninth Circuit. Now in session. Good afternoon. Just one moment. We don't have anybody on the telephone. Is Judge Kleinstein on the phone? Okay, excuse me. I can hear you. Okay, this is a time for argument in United States v. Chase. And Judge Kleinstein is with us from Alaska by phone because he's unable to travel. And so we will proceed to hear the case and the appellant may proceed. Yes, thank you, Your Honor. May it please the Court. Brett Purcher appearing on behalf of the appellant, Stephen Chase. I would like at this time to reserve five minutes after rebuttal. The primary issue in this case, which we urge the Court to adopt, is that there is not a dangerous patient exception to the psychotherapist patient privilege as enunciated by the Supreme Court in Jaffee v. Redmond. What we would urge the Court to follow is the lead by the Sixth Circuit in United States v. Hayes that indicated that there was not a dangerous patient exception but still gives some reliance upon a psychotherapist obligation and duty to warn if in fact a determination is made surrounding concerns of imminent harm that can only be averted by notifying the third persons to which the harm is directed. What if the notice to the third party doesn't stop the threat? In other words, let's suppose that the person discloses information that indicates that unless restrained, taken out of action, this person will continue to be a very serious, serious danger. Do you rely then on the notion of involuntary commitment as the way of restraint instead of being subject to a criminal process? Well, I would. And the reason being is that in this type of a situation with Mr. Chase or any individual who is suffering from a mental disease or defect, that is the manner or the method in which we attempt to assist these individuals and by the involuntary commitment procedure. What if there's some impediment to getting the person restrained in that fashion? Is the criminal process then at sea if it can't use the only testimony or the only evidence that would enable the criminal process to restrain this person? Well, that's the competing interest, I would agree, is that aspect of the problem. And it is that I would say that I don't know of a situation in which the involuntary commitment proceeding would not facilitate the restraint that is necessary. And the reason being is that in involuntary commitment-type procedures in most states, and in Washington, which I'm familiar, a person can be restrained basically indefinitely if they're a threat of harm to themselves or to others at a property. And so I'm not sure what circumstance would exist to where that type of a procedure would not be appropriate as opposed to the criminal prosecution using, in this case, as a perfect example, the primary testimony, the conduit being the privileged communications made by the patient to the psychotherapist. That's the crux of this particular case. But for Dr. Dieter's disclosures, there wouldn't have been a prosecution or not in this type of a fashion against Mr. Chase. So under those circumstances, I don't think that ñ I can't at this time think of a situation where the involuntary commitment procedure would not be appropriate. Well, the district court here found that it would not be appropriate, would not be sufficient here. I'm sorry? Didn't the district court make such a finding here? Well, the judge did make such a finding in this particular case based upon the testimony provided by Dr. Dieter in that she didn't think that it would work based upon her prior experiences with Mr. Chase where she convinced him to voluntarily submit. But there's a difference between voluntary submission and involuntary commitment because in the circumstances where you have a voluntary submission, if you voluntarily submit yourself to the medical personnel, you can also voluntarily withdraw yourself from that particular situation. We didn't have a situation here where the involuntary commitment process was ever attempted. But the district court did discuss that and apparently reached the conclusion that that would not suffice. I mean, his order says specifically, ìDr. Dieter was questioned regarding whether involuntary commitment procedures could have sufficed.î Correct. The court concluded no. What basis do you give us for determining that conclusion to be incorrect? For it being correct or being incorrect? For it being incorrect. Well, I think we need to step back as to what that allowance does in a situation like this and also taking into consideration Jaffe and the cases that have dealt with that particular circumstance or the psychotherapist-patient privilege and how far it extends. Under those circumstances, if you have and you allow solely that the doctors make a determination that the involuntary commitment process doesn't apply, and therefore you can go ahead and seek criminal prosecution, there's a problem with that in a situation where the information or the evidence that's being presented against the individual is that which was privileged and believed to be privileged during the communication between the patient to the client. Now, if the court makes a finding that the involuntary commitment process was not appropriate, respectfully, I don't believe that based upon the information that was presented there in the trial below that there was sufficient evidence for that. The reason I say that is because Dr. Schiff was the primary therapist that was treating Mr. Chase. There is absolutely no evidence whatsoever that Dr. Dieter consulted with Mr. or Dr. Schiff and made a finding that combined, when we have both of these individuals providing treatment, that indeed he was an imminent risk of harm at that point in time. So you're going to rely on the weakness of Dr. Dieter's opinion that civil commitment was not viable in this instance? Well, it was, respectfully, again, I think it was incomplete. And the reason being is that as opposed to seeking that type of guidance from her supervisors, which she indicated before, that she talked with her lead supervisor at the hospital, she talked to the supervisor. There was never discussion as evidence in the record regarding the involuntary commitment process. The next step was to contact the Corvallis Police, which in turn contacted the FBI, and then she was basically in league with the FBI obtaining information or trying to obtain information from Mr. Chase. Counsel, this is Judge Kleinfeld. Yes, Your Honor. I think you've conceded that the duty to warn the object of the threat is an exception to the doctor's duty of confidentiality. The privilege is for therapeutic purposes. In order to get people to talk to the doctors, it strikes me that it's very hard to see the point of preserving the privilege once you've allowed the doctor to talk to the object of the threat. The confidentiality is already gone. So the therapeutic benefit is gone. Why preserve the privilege? Well, the reason being is that you still have the competing interests, and the Hays Court references that specifically, and also when you take a look at Tarasoff, which is where all this comes from, the Tarasoff court acknowledges that you may have a duty to warn, and they teach us that there's a duty to warn. But they also indicate in that court's reasoning that you need to be discreet so as not to give up any more information than is necessary in the duty to warn the individual. Well, that's a California state case, and Rule 501 says that this is a matter of federal court law. And I understand that. But with respect to the psychotherapists that are referencing it, that is what they are looking at for purposes of the duty to warn. In Jaffe, and it's also... Could you tell me, I know that there's no authority directly in point, and you know that you can find some suggestions and hints, but could you tell me what therapeutic benefit is there in telling the patient, I'm going to tell the object of your threat, in this case the FBI, but I won't testify against you in court, as opposed to everything you tell me is confidential. Well, I think there's a difference between what is to be provided to the patient in the sense that there's a duty to warn, and what the therapist's obligation is for treating the patient. And they are differing interests. And the Hays Court, again, makes reference to that, that there may be a duty to warn the individual, but that is apart from the obligation to testify against your client or your patient in a criminal proceeding. And it doesn't connect the two circumstances where there's a duty to warn. We oftentimes have situations to where a person, and most folks would, or not most, but many would suggest that any time a person commits a criminal act, there is some type of mental health issue that would cause the person to act in that fashion. But just because a person makes a comment that a therapist believes is necessary or requires the therapist to make a determination that they should warn, that does not in and of itself cut off the therapeutic nature that might be achieved by continuing on with the therapy. And so I don't see those as being mutually inconsistent in that it provides information to the client of what the parameters are for purposes of dealing with this type of a serious threat, if in fact the serious or the threat is something that is not just serious but is an imminent threat. And that's what's significant. Counsel, the government makes an alternative argument that in this case, your client waived the privilege in a variety of ways, including the application for benefits based on his mental condition. What is your response to the arguments concerning waiver, separate and impartial? Sure. There are many cases that are starting to deal with that issue after the Jaffe Court came out, and there's a variety of ways in which we take a look at the waiver. A waiver, as we know, needs to be a knowing and voluntary waiver of some type of object, like in a statement, knowingly and voluntarily giving up your Fifth Amendment rights. In a waiver situation like this, if you're providing information to a mental health professional for purposes of seeking assistance, we want to foster that. Particularly in the workplace, if a person, in some of the cases that were cited, the materials talk about that if the person is submitting themselves to an evaluation in the workplace under an EAP, we're not going to say that that waives the privilege at some later point in time. That seems to me potentially different from a situation in which someone has affirmatively sought to achieve the goal of obtaining benefits on account of something. It's like filing a lawsuit because you broke your leg. You then open up all your medical records about your leg that might otherwise have been private. And here, what is the effect of having asked for benefits? With respect to the waiver, I don't think that waives, nor should it waive, the idea that you are still going to have a psychotherapist patient privilege during those circumstances. If it does, then if that were to be the case, then there would absolutely any point in time when you're seeking to get mental health benefits or assistance in some fashion, and some other area arises, that would potentially open it up that your innermost thoughts would become, would be discoverable. Not necessarily relevant, but discoverable. Were there any written waivers signed by your client in connection with that? I don't recall seeing any here. And also, there was no references whatsoever in the governance material that there was anything germane to this to Dr. Dieter that was submitted for any mental health professional to obtain benefits. There's nothing in the record that suggests that. Typically, typically, when you make a request for benefits and you see a psychologist or a mental health professional, what is provided are the results, such as the person suffers from schizophrenia or they suffer from bipolar disorder. But the background information, in my experience, is not provided along with the finding. And so under those circumstances, they might say, well, this is what the person suffers from. But the background information is not something that is necessarily going to be provided or discovered. I'm trying to understand if your position is an all-or-nothing position, and that is that the privilege would never give way in terms of compelling testimony in a criminal trial. I don't think it ever can. I simply don't think it can. I think that's, and that's why I think the Hayes Court is pervasive or persuasive here. The other reason that I suggest that, the way that the Jaffe Court's decision has been expanded, and Jaffe, remember, was a civil case that dealt with a 1983 action dealing with a licensed mental health professional or a licensed social worker. There are other cases within the Northern Districts of California that I cited in the material that reference that even unlicensed social workers would still have the psychotherapist patient privilege. Well, if you start to expand what is covered under those circumstances, then any time you have a situation to where a person believes, whether they're trained or untrained specifically, they can disclose that information. And the Hayes Court makes this. Let's take it a step further. If we assume that one of the ways to evaluate whether it could be averted only by means of disclosure were to first be required, in effect, to seek State remedies for commitment. So you go and you seek, the therapist seeks the involuntary commitment. However, subsequent court hearing determines that the patient doesn't meet the requisite criteria for involuntary commitment. So now they're back out. And then they're back in your office and they're saying, guess what, I'm after the President again or whomever, the FBI. The therapist now believes, even though the commitment hasn't been successful, that she needs to tell the Secret Service or the FBI again. So she goes back and does that. Are you basically kind of like on a hamster track for back and forth on that topic, or is there at some point where the privilege would give way, in other words the public interest would start to move in there, so that the only way to actually contain this would be through an arrest process based on the threat? Well, without conceding that, the problem that I have with that and that we have collectively is that where is it that you draw the line in the sense of what is to be disclosed? You could say that, well, we will recognize the dangerous patient exception to notify third persons. But in this particular case, it went completely over the top. It wasn't just a situation of notifying. She became an agent of the FBI. She provided information that was a basis for a search warrant. And so that is well beyond. And I understand that. Maybe I'm asking, in your ideal world, you said you would write a rule that it could never give way. But then I'm suggesting to you that there's a real impracticality with that rule in terms of balancing the threat with the privilege. And if there's some middle ground, what would be the practical middle ground that would work? Well, I don't – from a realistic point of view, as you're asking, does this keep on going forever? I don't think so. And the reason being is that if exactly what occurs, as you said, occurs, and the person gets back out in the back of the therapist's office, guess what? I'm going after the person again. And they do it again. You've got this history that's been built up that would likely keep the person involuntarily committed until these delusional aspects are gone. Or if they are not, then the person would not be released. And that's what the beauty is of the involuntary commitment process, is that, indeed, it is involuntary. And we are relying upon a trained professional to make a determination. Counsel, I'm thinking that here it isn't just a threat giving rise to potential involuntary commitment. The threat itself was the crime. My concern is if Chase had stolen the receptionist's purse or if he had punched the psychiatrist in the nose, they could testify about those crimes. This is another crime. Why can't they testify about this crime which had taken place in their office? Well, the difference is that I would assert that in a situation where there's been an assault or a theft, those are physical-type crimes that are acts. In this particular case, what we're trying to determine is the mental state of the individual as to whether or not the threats were reasonable. That's the difference between the two. I don't get it. I thought that the mental state that the statute spoke of was intent to retaliate. And he said he had an intent to retaliate against the FBI because of their handling of his case. That's correct. But it also deals with a reasonable-person standard, and there would be an issue as to whether or not a person who's seeking psychotherapy would- What words are you referring to in the statute? I don't see that in the statute. I'm referring to, in the case that was relied upon by Judge Hogan that dealt with 18 U.S.A. 115, I want to say the Osaka case. I'm looking at Section 115A1. Correct. And I don't see what you're talking about. Well, in the case law that interprets this particular statute, the intent needs to be reasonable in the sense that it should be reasonable for the- in this case, the jury must reasonably believe that the intent was a meaningful intent, I guess, as opposed to an unmeaningful intent. For example, any type of an individual who, say, was housed in a mental health institution could say that I'm going to kill the president. Well, that is a threat that is being made, but it would be reasonable to expect that a person who has absolutely no means whatsoever is committing a crime, even though under the circumstance of the statute as it's written, that would be a crime. So I would assert that in this situation, we need to take a look at the context in which the statement is made. There's a tremendous difference when you are hoping that a person, such as in Mr. Chase's position, is venting his expressions, that, indeed, they will be vetted, and we want to encourage that as opposed to not venting these expressions and something horrible happening. That's the problem. That's the difference, I believe, between these two situations. Mr. Pertzer, how do you deal with the specific language of the California Evidence Code, Section 1024, which appears to me to define the scope of this analyst-patient privilege? And it says when the patient is dangerous to himself or to another person and the disclosure of a communication is necessary to prevent the threatened danger, it says there is no privilege. So, I mean, if there's no privilege, and as I understood your argument, you seemed almost to concede that the threat could be warned. You could warn the subject of the threat. But if that's true and you can warn the subject of the threat, then why isn't it the case that under this code there's no privilege and so then you can march into court and testify? Well, one, that's legislative as opposed to common law, and that's the one difference between the California Code and what we have with respect to Jaffe. The other is with respect to what the intention is. In your case, what is the basis for the privilege that you're asserting? Is it California law or is it some other law? In this case, it would be, well, we're relying upon the federal law, the common law, as determined by Jaffe. Okay. So, I mean, I — Is there some concept here, I'm not sure how California treats it,  Right. But is the concept not only that it would show the communication between patient and psychiatrist in addition to disclosing to the target that the person, that the doctor could wind up testifying in a criminal case, just the mere fact it's a criminal proceeding, but also that there may be some adverse effect on treatment if the person is put into a prison as opposed to a mental health? And if that's part of the analysis, how does all of the law relating to competency and treatment of people who are mentally ill in the criminal context play into it? I mean, there seems to be in Hays some notion that you get convicted and then you wind up just in a jail. Wouldn't there not be mental health treatment in a prison setting? They very well may. And I think that whenever — if your mental state is at issue, that becomes — it's — well, to answer your question regarding that it should apply, that — how do we deal with this thing? Are you asking if there would be a — Well, what we seem to be drawing — you're trying to get us to draw a line between, A, you can disclose to the target. Okay. And that does breach the confidence. But that's an author — you know, the psychiatrist isn't breaching her ethical duty in doing it because it's recognized. But on the other hand, you're saying, but if Judge Kleinfeld said, well, what's the big deal then moving to the next step and going into court to testify in a court of law to the same thing Judge Hogan said? I'm just going to let you testify that you — that this guy made the threat. I'll wait in textual testimony until later in the trial, but on the disclosing of the threat, if one then looks to Hayes, there's this argument that, well, it's different when you're going into the criminal trial process because of the consequences, the situation. And I'm trying to understand how you're drawing the line. Well, I would follow exactly what Hayes talks about, is that there's a limited right to testify in an involuntary commitment-type process. And there is not a right to testify in a criminal process. Well, that's assuming the conclusion. Right. Well, the difference is that we have to step back and say, well, why is the person there dealing with the psychotherapist in the first place? Because they've got a mental health disease or defect, and they're trying to get assistance for that. In particular, in Chase's case, anger was an overriding concern, and he would vent about these people had nausea and had been doing so for almost, well, eight years or so at the time that he saw the doctor. The idea is to get these folks help and to maintain that. If you allow the treatment provider to turn on the patient or the subject, well, there is, and given what ‑‑ Turn in what sense? In a sense of testifying. You're saying that the psychiatrist can turn on that person and put that person into a mental health facility involuntarily. Well, the difference, though, is that the difference from the involuntary commitment where the mental health facility versus the criminal arena is what is the open goal. Primarily in the criminal arena is punishment. There may be some ideas that we can rehabilitate. But in the situation dealing with the mental health facility, the goal is to rehabilitate and to treat the individual so we can make them and put them back in the mainstream of society. That is not necessarily the same goal that we have in the criminal justice system. It's primarily to punish. In fact ‑‑ Can I ask you the following before your time runs? I want to get a sense of the scope of your position. First, I think I understand the rule properly that we would assess dangerousness for the purpose of Rule 501 at the time the evidence is proposed to be admitted to court rather than dangerousness at the time of the earlier warning to the FBI or to whoever. Is that your position? Well, I think that we have to take a ‑‑ that is a difficult question because that is transient. It doesn't stop at one point in time. In this case, it's an example of it. I'm asking you, do we assess dangerousness for purposes of the dangerousness exception to the privilege for purposes of Rule 501 at the time the evidence is thought to be introduced, or do we assess it at an earlier time when the warning was given extra judicially, say, to the FBI? Well, I think it needs to be looked at at the time in which the statement was made to put it into a ‑‑ At the time of which statement? Well, at the time that the psychiatrist was making the determination that the danger was imminent because at some point later in time it no longer applies. But what is the following? We come to court, the criminal prosecution is going forward, and the psychiatrist is quite convinced, and this may or may not be this case, and we have ample evidence to know that whatever dangerousness might have existed at the time she gave the warning to the FBI has entirely gone. He is not at this time dangerous. Do we assess dangerousness now to say he's not dangerous now? They're trying to punish him. He may or may not have committed a crime and he may or may not be punishable. But in terms of the exception to the privilege, do we assess dangerousness now? He is not now dangerous. Well, and you're asking me where do we draw the line? Well, I'm asking you at what point in time do we assess dangerousness for purposes of Rule 501? Well, for purposes of whether or not the person is dangerous needs to be assessed at the time that the psychotherapist makes this determination that imminent danger is there because ‑‑ Well, I think that's the wrong answer from the standpoint of your client. Well, the reason being is that if we wait, the question is what are we going to do after that? My concern is if I say that it's at that point in time then the danger is no longer present, then she can't testify. If I say that, well, the danger is there at that point in time for purposes of allowing the doctor to testify in the involuntary commitment process, then we're okay. Then it doesn't really matter. That's where the difference is. That's why I think we have to draw a distinction. I'll ask you a different question, and that is in this case the psychiatrist, the psychotherapist herself, Dr. Dieter, was asked to testify. Correct. And in that sense it very much looks like from the standpoint of the patient that my doctor has turned on me. Correct. My doctor is up there on the stand trying to put me in jail. What if instead of asking Dr. Dieter to testify, we were to try to introduce an exception to the hearsay rule, the FBI who said, well, Dr. Dieter called me and said that the defendant said X. Now, that could come in as an exception to the hearsay rule as a defendant's admission. Well, only if the person had the authority to make that admission, which he doesn't because the privilege rests with Chase. Well, that's why I'm asking you, does the privilege exist to keep out any testimony as to that, whether it's from the psychotherapist or for anyone who might have heard the psychotherapist give the warning? Well, I think that, again, the privilege rests with the patient. And so if the psychotherapist told anybody and they were seeking to introduce that, then that would be you should not be allowed to introduce that. So your position goes beyond merely that the psychotherapist can't testify. Anyone who heard the psychotherapist give the earlier warning, say, to the FBI, can't testify as to that warning. Correct. Okay. Correct. Even if the warning is a bare bones, in other words, the privilege only gives way for a narrow thing, which is you can say, you know, we think there's a threat, we think there's a concern, and here's what it is. Your view is even that limited testimony could not be introduced, be it the psychotherapist or the law enforcement agency. Well, in a criminal case? In a criminal case. No, I don't think it's no. No, because I don't think you can make gradations here. It's either it is or it's not. And my position would be that you simply cannot breach the privilege and allow the psychotherapist to testify against the client. Counsel, you have about one minute left. All right. And I'd like to reserve the rest for Ramon. Good afternoon, Your Honors. Jeffrey Kent from the U.S. Attorney's Office in Eugene, Oregon, the prosecutor of the Chase case. A couple of the judges have asked questions which, in my assessment, go to the heart of the issue in this case and really cast Hays as a very aberrant decision, not only inconsistent with general privilege law, which in a Hornbook sense says once there's an exception to the privilege, you know, there's no reason to bar the testimony. Well, that wouldn't be true here, where the whole fundamental predicate of the privilege is the mental health and treatment of the individual. There's been an exception because of the notion of a targeted individual. But it's not from that, the interest in protecting a targeted individual, automatic to leap to say, therefore, now you're going to let this person not only be subject to the disclosure of the object of this illness, but now you're going to put him in jail for the testimony of his doctor. It seems to me that's a qualitative difference that we're wrestling with here. And if you're suggesting you jump automatically from one to the other, I find that difficult to make. I'm not aberrant because I agree with Hays on that, though. Okay. Well, most respectfully, Your Honor, I think when one takes a look at privilege law in general, I don't know if there's any, perhaps there are, instances in which we only have a privilege that, for lack of a better term, is half pregnant. I mean, once the disclosure is properly and legally made, there is no privilege. And the ---- Well, who's making the disclosure here? Here, it's not the patient who's making the disclosure and waiving the privilege, if that's what you're suggesting. I agree. But here is a person who has received the information, and I believe the thrust of the law is to protect that person against some violation of ethics or whatever, saying we'll recognize the privilege, but it, as Tarasov said, we have to let it give way so that you're not harboring, that is, as the recipient of this dangerous information, you're not harboring information that could avoid somebody getting killed or seriously beaten up. You could become an accessory in some theory otherwise. So, again, I'm not sure. Well, you know, obviously in all privileges there's societal interests that compete with one another. As GFE itself indicated, the Supreme Court agrees that therapy is a positive ingredient in society to treat mentally ill people. However, all privileges have exceptions. And in this instance, when the patient becomes significantly threatening, immediately threatening, and as a practical matter the only means to protect typically unwitting third persons, which was true in this case, people who didn't even know that they were in danger as early as a week after this was finally disclosed, the pendulum shifts in favor of victims. Well, it has. I mean, that's been conceded. What we're not talking about is what do you do to restrain the individual. What's your response to the argument that there are mentally directed, mental health directed remedies available in the system, involuntary commitment being chief among them? Why can't you deal with it there? Why is it necessary to also use the doctor's testimony to convict them of a crime, put them in prison and punish them? The earlier oral argument in this case, Your Honor, I asked the panel to take judicial notice, although I'm not sure that's the proper concept. But the reality is that our mental health system has collapsed. And here we have an individual. What does that mean? What are you trying to convey? Well, what I am conveying is that the beds available for involuntary commitment actions are sparse. But don't you think that someone who has threatened to kill a number of people would have a fairly high priority amongst the available beds in Oregon? Well, my own opinion based upon the evidence in this case, and I believe the opinion of Dr. Dieter, who was the longtime treater, was that this individual was, I guess you would call him a functioning mentally ill person. And in this scenario, obviously Chase was able to function from day to day. He vacillated in his feelings. But wouldn't we be in a different position if you were making that same argument after a civil commitment hearing or a court had said this is a situation with Mr. Chase? Instead, we have a unilateral disclosure, which, albeit made in good faith, is entirely subjective. So you not only have the psychotherapist making the judgment, but she's also gaming what she thinks the legal system is going to be. So I guess my question is, how does she basically gets to give away the privilege? The privilege then rests in the hand of the psychotherapist. Is that the rule? Absolutely. When the dangerous patient exception is applicable, where you have an immediate, serious threat, where the only practical means of dealing with this individual is through disclosure, to warn third persons. But you could warn the third persons without using the testimony in the criminal process, could you not? Yes, you could. Okay. And that would presumably fulfill the public interest of protecting potential victims or third parties, would it not? Temporarily. Okay. In other words, it would be our assessment, taking a look at all the evidence in this case, the items that were seized at the time of the search warrant, that indicated, among other things, that he had hired a private investigator to find the home address of an attorney who was on his hit list a week before, and to find the secret address of the Kennedys who were attempting to hide themselves from the wrath of this individual who had visited hell on their lives. This was a person that went beyond threatening. He went, as the doctor observed, to ruminating. And from ruminating, he went to planning. And from planning, he was on the brink of acting on these very serious threats where ‑‑ Do you think that the good judges of Oregon, on hearing that, might not just say, this is precisely the kind of individual that ought to be committed? Are you not willing to leave it in the first instance to at least one pass at the court system? I believe, Your Honor, that there are too many, particularly given the evidence of this case, where it was not just the subjective decision of the psychiatrist. She saw lists. She saw indications that he had the instrumentalities, that he had guns. There were objective indicators that supported her clinical assessment that this individual was on the brink of acting out. In fact, he set a deadline. If things don't go my way in court next Tuesday, I'm going to go and have my form of justice, and all the people on this list, including the FBI, are going to get it until someone takes me out. Well, that justifies warning the authorities in putting him perhaps in protective custody or commitment, perhaps. But what is the authority for ‑‑ I'm having a little trouble finding any legal authority for the proposition that the therapist can testify in a criminal trial about privileged men? Hopefully, the court received some supplemental authority that I provided by letter, and I flew out and ‑‑ Yeah, what is the strongest authority that ‑‑ Well, all four ‑‑ I think three of the four states that were mentioned, including California. No, I'm talking about federal. Well, Glass, which was essentially the test that was adapted in this case, you know, virtually from the language of footnote 19 in the Supreme Court decision. So you had Glass authorizing testimony. Glass is the Tenth Circuit case? Correct. Violet was ‑‑ basically took the position that the crime fraud exception ‑‑ Right. He wasn't going for therapy at all. He was going to get disability benefits. Right. But one of the judges, I believe it may have been Judge Kleinfeld, asked over the phone, you know, wasn't the threat a crime in itself? And this court, a few months before the Chase opinion was issued, rendered the Alexander opinion in the attorney‑client realm, which essentially held that when an attorney is a percipient witness to threats made by his client, there is no privilege. Now, why wouldn't that be true in other realms of privilege? Are you drawing an analogy between the attorney‑client privilege and this one? Well, there's ‑‑ I know the analogy is not perfect, Your Honor. But they're both privileges. They're both privileges. And they're both very strongly founded in the law. In fact, the attorney‑client privilege is quite a bit older than this one, if I remember right. Well, it wasn't fully established in the federal common law until Jaffe ruled that there was such a privilege in 1995. In the attorney‑client realm, the lawyer's duty to disclose is not fulfilled by warning of the incipient crime. In other words, he still has to then testify. Is that correct? That is correct. He becomes, in the words of the Alexander opinion dealing with threats, a percipient witness to a crime. And in this instance, there were indeed serious, objectively verifiable threats against a number of people, very serious threats, including FBI agents. Were those ‑‑ was that enough evidence to convict him without the testimony of the therapist? I would say no. Essentially, it is my evaluation in this case that the case is nonprosecutable without the testimony of the psychiatrist. Why is that? She was the percipient witness to the threats, Your Honor. She was really ‑‑ I know that Judge Fletcher mentioned a potential hearsay use through the FBI agents, but they, of course, only became aware of it after she concluded this disclosure was appropriate. I'm a little mixed up about the procedure here. To the count of conviction? Pardon me? Only ‑‑ there was only one count of conviction. Is that correct? That's correct. The count of conviction involved threats against those coming to serve a search warrant at the home. The defendant was not convicted of his threats against the FBI agents. And wasn't that heard ‑‑ wasn't that statement, that threat in count one, was that heard by the operator in the clinic? Two of the operators. Yes, yes. Those were ‑‑ but that was a distinct threat. But that wasn't privilege. That did not ‑‑ that did not invoke privilege issues. There, Mr. Chase called into the Kaiser Permanente offices trying to reach Dr. Dieter, and in the process said people are going to die if law enforcement shows up at my house. Dr. Dieter, who realized by then the matter had become a full‑fledged criminal matter, fortunately put Agent McMullen on notice just a couple of minutes before he got to the house that Chase was aware of the imminent execution of the search warrant. How far does your idea of exception carry? For example, are you limiting the exception to the matter that was communicated? Or are you saying, for example, if a psychiatrist chooses to disclose that someone's in imminent danger, that would entitle someone to put the psychiatrist on the stand and say, all right, now tell me everything that the patient told you, produce all the records. You began by saying it's an absolute black or white. Are you saying that once you violate, once the privilege, there's been an exception, you have a right to get into all the records? Or are just the matters communicated outside to third parties? Absolutely it is not a privilege that would go beyond the subject matter of the threats. We definitely are of the belief that it needs to be restrictively applied to pertain to only matters relevant to the threat. Presumably that would be subject to other evidentiary rules like relevance and prejudice. But I mean, I gather what you're saying is that once a threat has been communicated to third parties, you believe that law enforcement would have a right to inquire the basis for the belief and all communications relevant to that belief on the part of the psychiatrist, right? Even though those communications had not been disclosed to third parties. No, in fact, law enforcement and the prosecution, in my assessment, acted in a very circumspect way. I'm not talking about this case. I'm talking about how you view, how privilege plays out. Because it's not just this case, it's other cases and how it plays out in a civil context because these are rules of evidence that apply in both civil and criminal cases. In this particular case, Judge Hogan conducted lengthy evidentiary hearings to first determine whether or not we, we meaning the prosecution, would have access to Dr. Dieter's notes. We did not receive that material. I understand that. I'm just asking a more general question about where you think privilege, how far the privilege exception extends. I don't think it should go any further than that. That the only material that should be produced is that germane to the threat. Does that include information not communicated to third parties? It well could, yes. I mean, in other words, you're telling the third parties. I think the way law enforcement generally works in this situation, third parties are contacted to advise them that they're, in law enforcement's assessment, been a serious threat against their and their family's well-being. They do not get into all the details. I would say that there is a fuller discussion of what is appropriate, what is not. By contrast, when it's looked at from a criminal prosecutorial perspective, there's a fuller fleshing out as to what is, you know, what is appropriately admitted and what is not. I was going to say, in view of your answer to Judge Thomas on that issue, excuse me, where does your waiver argument go? In other words, what, in your view, you make that argument in the briefs. Yes. You just haven't today. Pardon me. What did Mr. Chase do with respect to the threats that opened up that area of inquiry? The waiver issue is really a twofold argument. In fact, I believe the panel decision disagreed with the government's casting of the concept as a waiver. They preferred the concept of forfeiture in the context of an application for benefits and any ---- What was the application for benefits? Was it merely for reimbursement for medical expenses, or was he saying I am disabled because of my mental condition? He was receiving $100,000 a year in tax-free money through a private insurance company and through Social Security under a psychiatric disability policy. And had he revealed in seeking those benefits that he was making threats to people or that he was mentally ill? Again, the court, meaning the district court, was very careful in that giving the government access to all of that information. And my memory of the proceedings below is Judge Hogan allowed us to see more of the Social Security records than he would the insurance company records. So the short answer is you don't know the answer? Correct. I mean, I never had full access to those records to know, but I doubt that he would have admitted to threats. I think there was a general anger issue that ---- Is there anything in the record to suggest that there was a written waiver of any kind that he signed concerning what would happen to his medical records concerning his mental health? I remember you asking that question when Mr. Pertzer was up. Again, I didn't have access, and I don't believe the government had access to the full insurance company records. But Dr. Dieter testified in, I believe, the initial proceedings prior to trial, the evidentiary ruling proceedings, that she was required to periodically provide information to the insurance company, who, of course, would be interested as to whether or not they had to continue to pay $75,000 a year under the policy. Yeah. Normally, the reason I ask the question is that normally those waivers are quite narrow. Let's say I authorize my doctor to talk to the insurance company about whether I'm entitled to benefits, and not more broad than that, and that's why I've been asking. Yeah. I don't believe the record below has established whether or not there was a waiver and what the breadth of the waiver was. The other question that I have for you had to do with your very first remark, which is that Hays is an aberration among the Federal common law cases. Yes. Have you kind of done a count of how many cases there are, both at the district court and circuit level around the country, on this issue and where they fall out? Yes. I was hoping through my filing of the supplemental authority in a State survey that that count would be more comprehensive. Well, let me just narrow my inquiry, because as I understand the Federal rule, it asks us to look at Federal cases and not so much at State cases. Correct. And I know there's some intellectual interplay, at least. But just among the Federal cases, what is your best count of where things stand? Again, the Glass case out of the Tenth Circuit, the Violette grand jury case, but that was on an attorney-client privilege theory somewhat different than or quite different. That's the crime fraud exception. Correct. You really can't put that in the same category as Glass, could you? Correct. But one of the reasons I describe it as an aberration is not just in the context of the psychiatric privilege or the psychotherapist-patient privilege, but in privilege law in general, that as a couple of the judges have asked Mr. Pertzer, well, once the privilege is accepted, E-X-C-E-P-T-E-D, can we pull it back in and disallow testimony? Well, obviously, Hayes thought we could and chose to limit it. Now, the Millard case out of Oregon, and I realize that State law is only persuasive. It's not binding. Jaffe obviously hoped that there would be some parallels between Federal and State law, but ultimately recognized that it was a Federal common law decision. But Miller, I'm not sure Miller was ever cited again after it was decided, and it was dicta that was quite unnecessary to the opinion, because in that particular case, there was a confession or an admission to a murder. Now, why — If you go deeply into Miller, I'd like to ask a question that I asked Mr. Pertzer, which is — Yes. I'm trying to make sense of this somewhat Delphic footnote 19 in the Jaffe case — Yes. — which says that, well, there's certain situations where the privilege must be avoided. For example, if a serious threat of harm to the patient or to others can be averted only by means of disclosure by the therapist. Now, clearly, Jaffe is talking about the application of Rule 501. Otherwise, we wouldn't be talking about it here. Correct. So I think clearly, unless the footnote has somehow drifted off and we've lost track of what it's talking about, it's not talking about threat and then an extra judicial disclosure, say, to the FBI, watch out when you do that search warrant. So I'm asking, well, do we address dangerousness and the aversion of the threat of harm or the risk of harm at the time the psychiatrist is being asked to testify? No. Why? Because — Let me make it clear. Let us assume, although that may not be the fact of this case — Yes. — that at the time of the criminal trial, through a successful course of treaty, this defendant is not dangerous. But we're now being asked to testify about a threat that was made earlier that, if made, was illegal. Correct. So there may have been a crime. But I'm asking a question of, does this premise define there being no dangerousness at the time the testimony is thought to be introduced? Yes. I think we need to go back to when the crime was committed, which was a threat that was imminent, a threat that was serious, a threat that could only be averted by means of disclosure. So you're saying that the evidentiary rule that under this footnote seems to say a threat to be averted at the time, or at least under the rule, we look not to the time that the testimony is being offered, but to some earlier time when there was a danger. Correct. Okay. Yes. That would be our position. Now, transferring the concept to the involuntary commitment system — Let me ask you, let's say a threat is made, that threat is communicated to the object of the threat, then what does law enforcement do about it? Well, in this particular case, it investigated it. All right. And it executed a search warrant because the doctor said, I have seen a list that includes personal information concerning these targets of his threats, which he showed me. So based upon that, and guns, she had talked about guns. And so a search warrant was obtained, which allowed law enforcement to go out and attempt to determine whether or not there were objective indicators that the threat was indeed serious. And that's what was done in this case. And then it was followed up by further interviews, most of which took place down in this area by virtue of Mr. Chase's prior business being down here, in which a series of a series of people and this hit list or target list were interviewed, each of whom had their own chronicle of horrors that they'd been through. Not just not just the individuals, but the attorneys who were involved in the litigation. And that, again, helped provide objective indicators that this was a threat that was worth taking seriously. Wouldn't it? Wouldn't it? If you look at a threat that, say, made in January and the it's disclosed that the trial on that threat is, say, in November, the following November. Wouldn't the defendant's state of mind in November be irrelevant to the trial of the validity of the threat in January? I would agree with that premise. Yes. In fact, it would probably be prejudicial to put on evidence that he's not here to fruitcake in November when you what you really have to decide is, was that a valid threat in January? Right. We have to freeze the frame at the time of the threat. And at the time of and I subscribe to that. But if we look at the threat to the law enforcement, not the FBI, was there anything about the prior threats or the therapist's testimony that was relevant to that specific threat? No. The last threat made was a separate incident involving the calls to the receptionist. So in that same trial, then you have all the other testimony, which is you in this conviction, you have the therapist's testimony plus all the other threats that were made that came in in this conviction as well. Yes, because it was the government's it was the government's theory that that was relevant evidence that needed to be heard. The jury concluded that it was insufficient evidence to find threats against the FBI agents. The FBI agents were probably the most difficult threat on the list because there had never been any direct contact. OK, thank you. Are there any questions in specific? Rattling off the one area that I that I have a problem with with the government's position is that is that this is the only way to avert the threat by by prosecuting an individual. When you do that, that totally just obliterates the idea that a person who's suffering from some type of a mental illness can receive treatment and provide into the therapist and speak freely to that individual. Well, I want to focus on the question you posed, not on what's the harm from it. But was this really the only way to address the problem? What concerns me here is that we're dealing not with a single individual target. It's not a John Smith you can go Warren. Dr. Dieter talked about having seen this long list of names. She didn't know who was on the list. She wouldn't have known how to contact some of the people. What's the practical alternative for her at that point? Well, the involuntary commit involuntary commitment process is always available. But then we go back to the question I asked some time ago, which is that basically says to the district court, you're wrong in the determination that that's an acceptable alternative. And that may be a valid point for you. But suppose let's take an instance where it's not available for some reason. Do we have a situation if there is no other alternative? Do we have an exception to the privilege? The I don't think so. To be to be you're willing to accept the harm to be suffered by that person because there's no other way to blow the whistle. Well, I'm not I just don't know how that would come about that. There was no other way to to eliminate the harm. That's that's the problem that I have, because I don't know of that type of situation. It seems to me the facts of this case become awfully close to that. Given the list, the nature of the list here, civil commitment is the alternative you've offered. District judges concluded that wasn't available. You're saying you disagree with that judgment. We should disagree with that judgment. But if he's right, is there anything else that that's available to try to protect the people who've been threatened? Well, if if that's all that happened, we probably wouldn't be here because if in fact it was just a situation for alerting the the FBI or law enforcement, that would probably fall in within something that we could all accept and be consistent with what we understand the Tarasoff talks to us about. But that's not what she did. She became an agent for the FBI and started to ferret out information for purposes of prosecuting her own client, totally unbeknownst to him. That's the problem we have here. And if we look at it. Thank you very much. The case disargued is submitted for decision. That concludes the court calendar for this afternoon. Court is adjourned.
judges: Schroeder, Pregerson, Tg. Nelson, Kleinfeld, Thomas, Graber, McKeown, W. Fletcher, Fisher, Gould, Clifton